# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**FILED**

**October 4, 2013**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**Warren Franklin and Charles Franklin,**
**Petitioners Below, Petitioners**

**vs)   No. 12-1288** (Kanawha County 02-MISC-160 and 02-MISC-163)

**Jim Rubenstein, Commissioner, West Virginia**
**Division of Corrections, and David Ballard, Warden,**
**Mt. Olive Correctional Complex,**
**Respondents Below**

## MEMORANDUM DECISION

Petitioners Warren Franklin and Charles Franklin, appearing *pro se*, appeal the order of the Circuit Court of Kanawha County, entered September 13, 2012, denying their identical consolidated petitions for a writ of habeas corpus arising out of prison disciplinary proceedings that resulted from an October 2, 2002 demonstration at Mt. Olive Correctional Complex ("Mt. Olive").[1] Respondent Corrections Officials, by counsel John H. Boothroyd, filed a summary response. Petitioners filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioners are two brothers who are inmates at Mt. Olive. Their prison history includes escaping from a prison in the State of Maryland and committing murder at the West Virginia State Penitentiary when it was located in Moundsville, West Virginia.

On October 2, 2002, a major demonstration occurred at Mt. Olive. The warden was advised of a demonstration started in the main yard by inmates at 8:30 a.m. At 9:17 a.m., the main yard was ordered closed. A Code Yellow-Emergency Count was issued at 9:30 a.m. Inmates were given an opportunity to return to their cells. Nonetheless, 278 inmates refused to return to their cells and remained in the main yard.[2] The warden then issued a state of emergency which was approved by the Commissioner of Corrections. The state of emergency remained in effect until October 17,

---

[1] According to respondents, the identical petitions were consolidated by the circuit court.

[2] Petitioners were not among the 278 inmates who were in the main yard. Petitioners were in Birch Hall when Mt. Olive was locked down.

-1-

2002.

During the lockdown and subsequent investigation into the demonstration, petitioners were placed in administrative segregation. During interviews, numerous inmates identified petitioners as having helped instigate and plan the October 2, 2002 demonstration. After the state of emergency was lifted, petitioners were issued violation reports charging them with "demonstrations" under Division of Corrections ("DOC") Policy Directive 325.00 which provided that "[n]o inmate shall organize, participate in the organization of, or participate in a group demonstration, protest, sit-down strike, 'sick-out', hunger strike, work stoppage or any other joint demonstration, or attempt to do any of the above." § 1.12.[3]

Separate disciplinary proceedings were conducted against both petitioners on October 25, 2002. Petitioner Warren Franklin was found guilty of violating § 1.12 and was sentenced to punitive segregation from October 2, 2002, to October 2, 2003 with a ninety-day loss of privileges and six months loss of "good time" credit.[4] Petitioner Charles Franklin was found guilty of being the "key person/organizer" of the October 2, 2002 demonstration and was sentenced to eighteen months of punitive segregation beginning October 2, 2002, with a ninety-day loss of all privileges and a one year loss of "good time."

After their terms in punitive segregation, each petitioner was placed in administrative segregation under Mt. Olive Operational Procedure # 3.31. Administrative segregation for Petitioner Warren Franklin was necessary in part because there were unresolved issues with inmate Russell Lassiter. According to his deposition testimony, Petitioner Warren Franklin believed that Inmate Lassiter had set him up regarding the October 2, 2002 demonstration and that placing him and Inmate Lassiter in the same general population would not be safe. Administrative segregation for Petitioner Charles Franklin was necessary in part because he had written letters that indicated his feud with Inmate Lassiter would end violently.

On January 5, 2004, Mt. Olive Operational Procedure # 3.31 was replaced by Operational Procedure # 3.36, the "Quality of Life" program. Petitioner Warren Franklin was placed at Level Three of the "Quality of Life" program.[5] Petitioner Warren Franklin completed Levels Three, Four, and Five and was released into the general population of Mt. Olive in the spring of 2005.

Petitioner Charles Franklin was also initially placed at Level Three of the "Quality of Life" program. However, in October of 2004, he was found guilty of violating § 1.19 of DOC Policy Directive 325.00, which prohibits the use and possession of drugs, intoxicants, or paraphernalia. Petitioner Charles Franklin was found with a cup of red liquid giving off a strong odor. The liquid

---

[3] The version of Policy Directive 325.00 then in effect was dated July 1, 2000.

[4] "Good time" is a statutory commutation of an inmate's sentence for good conduct based on each day the inmate serves his sentence. *See* W .Va. Code §§ 28–5–27(b) and (c).

[5] The "Quality of Life" program has five levels.

tested positive for alcohol content. Petitioner Charles Franklin was sentenced to sixty days of punitive segregation and a sixty-day loss of all privileges.

During the sixty-day loss of all privileges, Petitioner Charles Franklin made numerous phone calls and was, therefore, found guilty of additional disciplinary violations in November of 2004. In April of 2005, Petitioner Charles Franklin made an unauthorized phone call using his brother's DOC number and was, therefore, found guilty of an additional disciplinary violation. As a result of these disciplinary violations, Petitioner Charles Franklin was reduced from Level Three to Level One of the "Quality of Life" program. However, subsequently, Petitioner Charles Franklin completed the "Quality of Life" program and was released into the general population of Mt. Olive in May of 2006.

In April of 2002, petitioners filed identical petitions for a writ of habeas corpus seeking immediate release from segregation and return to a pre-detention status with the expungement of all disciplinary and administrative records since July 1, 2000. After each petitioner was released back into the general population, they altered their demands to include monetary relief for lost wages and pain and suffering. Petitioners were appointed counsel and were afforded the opportunity to present witnesses and documentary evidence. By an order dated August 10, 2007 the circuit court allowed the parties the opportunity to submit proposed findings of fact and conclusions of law.

On September 13, 2012, the circuit court entered an order submitted by respondent. The twenty-six page order contained numerous findings of fact and conclusions of law that addressed petitioners' various claims and found them to be without merit. The circuit court denied petitioners' petitions. Petitioners now appeal the circuit court's September 13, 2012 order.

We review the circuit court's order denying the petitions under the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioners assert that their second attorney failed to submit proposed findings of fact and conclusions of law as allowed by the August 10, 2007 order. Petitioners assert that they attempted to communicate with their attorney to no avail. Petitioners also requested that the circuit court appoint new counsel. The circuit court did not appoint new counsel; instead, it entered an order denying the petitions that was proposed by respondents. Petitioners assert that they were not served with a copy of the proposed order before it was entered. Petitioners argue that their due process rights were violated by their second attorney's failure to submit proposed findings of fact and conclusions of law and by the circuit court's failure to appoint them new counsel.

Respondents note that petitioners were represented by their first attorney up until the time all evidence was submitted and that petitioners state that the first attorney performed his duties professionally. The only task remaining for the second attorney was to review the transcripts and propose findings of fact and conclusions of law on petitioners' behalf. While the second attorney did not submit proposed findings of fact and conclusions of law, respondents assert the circuit court was fully capable of reviewing evidence, canvassing the law, and then applying the law to the facts of this case. Respondents argue that the circuit court had a strong factual and legal basis to deny the petitions. Respondents note that no general right to counsel exists in habeas cases that challenge the terms and conditions of confinement. Respondents argue that the circuit court's order denying the petitions should be affirmed.

"Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975). Petitioners contend that their constitutional rights to due process of law were violated by the manner in which their case was conducted after the submission of all evidence.[6] However, after reviewing the circuit court's September 13, 2012 order that set forth in detail the circuit court's factual and legal basis for denying the petitions, this Court finds that any error was harmless beyond a reasonable doubt because petitioners cannot demonstrate that the outcome of their habeas cases would have been different even if their second attorney had submitted proposed findings of fact and conclusions of law.[7] Therefore, after careful consideration, this Court concludes that the circuit court did not abuse its discretion in denying the petitions.

Having reviewed the circuit court's "Order Denying Petition for Writ of Habeas Corpus," entered September 13, 2012, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

---

[6] In their reply brief, petitioners complain that the circuit court restricted their personal access to materials produced during discovery. However, petitioners further indicate that their first attorney, who adequately represented their interests, had permission to handle and possess discovery materials. Therefore, petitioner's late complaint about how discovery was conducted lacks substantial merit.

[7] Similarly, even if there was a general right to counsel in habeas cases that challenge the terms and conditions of confinement, petitioners would not be able to meet the applicable standard to show that their second attorney was ineffective by failing to submit proposed findings of fact and conclusions of law. *See* Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) ("In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):(1) Counsel's performance was deficient under an objective standard of reasonableness; *and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different*.") (Emphasis added.).

For the foregoing reasons, we find no error in the decision of the Circuit Court of Kanawha County and affirm its September 13, 2012 order denying the petitions.

Affirmed.

**ISSUED:** October 4, 2013

**CONCURRED IN BY:**
Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WARREN FRANKLIN

v.

Civil Action No. 02-MISC-163

JIM RUBENSTEIN, Commissioner,
West Virginia Division of Corrections and
MICHAEL COLEMAN, Acting Warden,
Mount Olive Correctional Complex,

And

CHARLES FRANKLIN

v.

Civil Action No. 02-MISC-160

JIM RUBENSTEIN, Commissioner,
West Virginia Division of Corrections and
MICHAEL COLEMAN, Acting Warden,
Mount Olive Correctional Complex

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

On or about April 18, 2002, Charles Franklin filed a Petition for Writ of Habeas

Corpus Ad Subjiciendum with the Circuit Court of Kanawha County. On or about April

22, 2002, Warren Franklin filed a Petition for Writ of Habeas Corpus Ad Subjiciendum

with the Circuit Court of Kanawha County. Both petitions, including the affidavit, are

identical. The ground raised by each Petition was "[t]he petitioner contends that he has

been subjected to punitive and administrative segregation in violation of his right to due

process of law, double jeopardy and proportionality principles." The relief requested by

each petitioner was to:

> Order his immediate release from segregation and his return to his pre-detention
> status.
>
> Order the respondents to wholly expunge from all files all records and reference to
> all disciplinary and administrative proceedings had against the petitioner since
> July 1, 2000.
>
> Any and all further relief the Court deems meet and proper.

1

The petitioners, Charles and Warren Franklin, were appointed counsel and each party was afforded the opportunity to put forward witnesses and documentary evidence in this matter. During the pendancy of the litigation, both Franklins were released from administrative segregation and the Franklins have altered their demands to include monetary relief for lost wages, pain and suffering and other damages due to their punitive and administrative segregation. Upon the parties having the opportunity to submit proposed finding of facts, conclusions of law and decision by August 10, 2007, this matter is mature for decision. The Court, hereby, makes following finding of facts, conclusions of law and decision:

## FINDINGS OF FACT

1.    Charles and Warren Franklin are brothers and have been incarcerated at the Mt. Olive Correctional Complex ("Mt. Olive"), West Virginia's maximum security prison, since 1995. From 1982 to 1995, they were incarcerated at the West Virginia State Penitentiary in Moundsville, West Virginia.

2.    Charles Franklin is serving the following sentences in West Virginia: Aggravated Robbery (Morgan County) – forty years *(Bate 912)*; Assault in the Commission of a Felony (Morgan County) – two to ten years concurrent to the forty year sentence; Aggravated Robbery (Hampshire County) – sixty years concurrent to the sentences in Morgan County *(Bate 905)*; Second Degree Murder (Marshall County) – five to eighteen years consecutive to the Morgan and Hampshire County sentences *(Bate 893)*. In addition to these sentences, Charles Franklin has yet to serve a prison sentence in Virginia for two counts of attempted murder *(Bate 898)* and to complete a life sentence in Maryland for murder *(Bate 906)*.

3.    Warren Franklin is serving the following sentences in West Virginia: Aggravated Robbery (Morgan County) – forty years *(Bate 949)*; Assault in the Commission of a Felony (Morgan County) – two to ten years concurrent to the forty year sentence; Aggravated Robbery (Hampshire County) – sixty years concurrent to the

sentences in Morgan County *(Bate 948)*; First Degree Murder (Marshall County) – life without mercy consecutive to the Morgan and Hampshire County sentences *(Bate 932)*. In addition to these sentences, Warren Franklin has yet to serve a prison sentence in Virginia for two counts of attempted murder and two counts of use of a firearm during the commission of a felony *(Bate 943, 944)* and to complete a life sentence in Maryland for murder.

4. Charles Franklin was also an inmate in West Virginia from 1975 to 1978. *(Bate 884)*. He was released on parole in May of 1978 and absconded from parole supervision in September of 1978. *(Bate 925)*. After he had absconded from supervision, Charles Franklin and his brother Warren killed a man in Maryland. Both Franklins were convicted of murder and given the previously cited life sentences in 1980. *(Bate 908, 909)*.

5. In 1981, Charles and Warren Franklin escaped from prison in Maryland by sawing through the bars of their cell. *(Bate 910, 911)*, *(Charles Franklin Depo. at p. 31)*.

6. After their escape, Charles and Warren Franklin made their way to West Virginia, broke into a home and held a mother and her four boys at shotgun point. *(Bate 920, 921, 937)*. They shot one of the boys in the head, left him for dead, and then forced the remaining family members into the trunk of their own car. They drove off in the car and left the family locked in the trunk of the car after they had abandoned it at a bar. Outside of the bar, they then pulled the shotgun on a couple who were leaving the bar, commandeered their car and drove off with the couple as hostages. After driving 270 miles, Charles and Warren Franklin were caught in Virginia after they crashed during a dangerous high-speed chase in which they fired shots at the police. *(Bate 901)*. They were subsequently returned to West Virginia for trial and convicted in Morgan and Hampshire counties pursuant to plea agreements.

7. In 1986, while incarcerated in the West Virginia State Penitentiary in Moundsville, West Virginia, the brothers murdered an inmate, Kent Slie. The pre-

3

sentence investigation for Charles Franklin, described that inmate Slie had been beaten by a 16 inch ball pen hammer, stabbed by a homemade dirk and then urinated upon. *(Bate 889)*. Warren Franklin was convicted by a jury of first degree murder without a recommendation of mercy. Charles Franklin was convicted by a jury of second degree murder. Also involved in the murder of inmate Slie was William "Red" Snyder. Snyder was himself murdered in 1992 by inmate Russell (Rusty) Lassiter. *(Bate 890)*.

8.     During his incarceration in the West Virginia State Penitentiary, Charles Franklin has been found guilty in prison disciplinary proceedings of fighting (1983), riots (1984), assault (1984), contraband (1984), fighting (1985), contraband (1985), contraband (1985), contraband (1986), refusing order (1986), destruction of property (1986), destruction of property (1986), possession of a weapon (1986), refusing an order (1986), assault (1986), possession of a weapon (1986), contraband (1986), contraband (1986), riot (1986), assault (1986), contraband (1988), contraband (1991), stolen, loose or forged scrip (1991), contraband (1994). *(Bate 884-886)*. Moreover, during his incarceration in the West Virginia State Penitentiary, Charles Franklin spent considerable time in both punitive and administrative segregation.

9.     During his incarceration in the West Virginia State Penitentiary, Warren Franklin has been found guilty in prison disciplinary proceedings of stolen or forged scrip (1982), riot (1984), contraband (1985), possession of weapons (1986), destruction of property (1986), assault (1986), possession of weapons (1986), intoxicants (1986), possession of weapons (1986), destruction of property (1986), destruction of property (1986), possession of weapons (1986), intoxicants (1986), tampering with locks (1986), riot (1986), assault (1986). *(Bate 929-931)*. Moreover, during his incarceration in the West Virginia State Penitentiary, Warren Franklin spent considerable time both in punitive and administrative segregation.

10.    Upon the closing of the old West Virginia State Penitentiary, Charles and Warren Franklin were transferred to Mt. Olive in 1995. Once at Mt. Olive, they did not

have any disciplinary rule violations until October of 2000.

11. On October 2, 2000, a major demonstration broke out at Mt. Olive.

12. At 8:30 a.m. on October 2, 2000, the Warden was advised of some inmates starting a demonstration in the main yard. At 9:17 a.m. the main yard was ordered closed. At 9:31 a.m. a Code Yellow-Emergency Count was issued. Inmates were given the opportunity to return to their cells. Nonetheless, 278 inmates refused to return to their cells and remained on the main yard. A state of emergency was then issued by the Warden at Mt. Olive and approved by the Commissioner of Corrections. *(Bate 604)*.

13. This state of emergency remained in effect until October 17, 2000. *(Bate 606)*.

14. Mt. Olive conducted an extensive investigation into the demonstration. As part of the investigation, inmates were interviewed. During these interviews, Charles and Warren Franklin were identified by numerous inmates as having helped instigate and plan the October 2, 2000 demonstration.

15. During the lock down and investigation, Charles and Warren Franklin were placed in segregation.

16. Policy Directive 325.00, Section V.E. ("EMERGENCIES") 9.01 ("Suspension of the Rules") provides that "in case of emergency, any or all portions of these procedures [Discipline of Inmates]… may be temporarily suspended by the Warden/Administrator" and that "[a]ny inmate who is involved in or who has contributed to an emergency may be detained on the Warden's/Administrator's order without a hearing until the end of the emergency."

17. After the state of emergency was lifted, Charles and Warren Franklin were issued violation reports for "demonstrations" (Charles on October 18, 2000 and Warren on October 19, 2000). *(Bate 153, 431)*.

18. Under Policy Directive 325.00 (Discipline of Inmates) dated 01 July 2000,

5

"demonstrations" is defined under 1.12 Demonstrations as "[n]o inmate shall organize, participate in the organization of, or participate in a group demonstration, protest, sit-down strike, 'sick-out', hunger strike, work stoppage or any other joint demonstration, or attempt to do any of the above."

19. Separate disciplinary hearings for both Charles and Warren Franklin were held on October 25, 2000.

20. Pursuant to Policy Directive 325.00, Section V.B.9, 6.02(b) (Confidential Information), Major Paul Perry presented the confidential information and the confidential informants to Correctional Magistrate George Janice. This was done out of the presence of either Charles or Warren Franklin. Magistrate Janice deemed the informants and information to be reliable and credible and worthy of consideration.

21. According to confidential information received before and after the demonstration, the demonstration was supposed to be a peaceful type of sit down and that inmates were not supposed to stay in the main yard, but return to their cells afterwards. The demonstration, however, got out of hand and 278 maximum security inmates refused to return to their cells. According to confidential information, Charles Franklin was the key player in organizing the demonstration. Warren Franklin was also involved, but not quite to the point his brother was.

24. Charles and Warren Franklin both asserted as their defense to the charge of "demonstration" that they were innocent and did not have any involvement with the demonstration whatsoever. According to Charles and Warren Franklin, the first time they learned of a possible demonstration was on the morning of the demonstration when their supervisor George Hill at their work assignment informed them to go back to their pod and stay there.[1] According to Charles Franklin, he returned to Birch Hall and made

---

[1] However, according to the testimony of Mary Jean Royal, Charles Franklin had called her around 6:00 to 6:30 a.m. on October 2, 2000, and informed her that rumor had it that there would be a demonstration that day and that he would go about his normal day-to-day routine. According to Ms. Royal, Franklin told her this because he was afraid he might be accused later of being involved in the demonstration and that he may not be able to call her for a while (Detention and punitive segregation can be accompanied by a loss of phone privileges).

6

himself a cup of coffee. Charles Franklin's testimony at his disciplinary hearing indicates he and Warren returned to Birch Hall at approximately 8:30 to 9:00 a.m. and both Franklin brothers were, thus, safely in Birch Hall when Mt. Olive was locked down due to the demonstration on the yard.

25. On October 26, 2000, Magistrate Janice found as fact regarding Charles Franklin that "[b]ased on violation report, testimony of Major Paul Parry, information received from confidential informant (determined to be reliable and credible), that the defendant was the "key person/organizer" of the 02 Oct 2000 demonstration, the [sic] he organized the demonstration then went to the pod and did not participate ... same information came from (20) inmates that are determined to be both credible and reliable, the finding is guilty." *(Bate 432).* Charles Franklin was found guilty of "demonstration" and given 18 months in punitive segregation beginning October 2, 2000, 90 days loss of all privileges, and one year loss of good time.

26. On October 26, 2000, Magistrate Janice found as fact regarding Warren Franklin that "[b]ased on the violation report being testified as true and accurate by Maj. Perry ... information gained from confidential informants that the defendant was one of the main players w/his brother – main player (organizer). He encouraged other I/M to take a stand & participate in the demonstration." *(Bate 154).* Warren Franklin was found guilty of "demonstration" and given one year in punitive segregation to begin October 2, 2000 and end October 2, 2001, 90 days loss of privileges to begin October 26, 2000, and a loss of six months good time.

27. Both Charles and Warren Franklin received credit for their time spent in segregation prior to October 26, 2000. Pursuant to Policy Directive (325.00, Section V.E. 9.01. e ("Any emergency detention or suspension of privileges shall be credited to the

---

According to the testimony of inmate David Taylor, who was called by Charles Franklin at his disciplinary hearing, he and Charles Franklin did not know of a demonstration until that morning when people coming out of "chow" hall were asking them if they were going to "sit down."
Neither Royal's or Taylor's testimony appears consistent with the Franklins' testimony.

punishment set by the Magistrate, if the inmate is found guilty of any charge.").

28. Prior to October 2000, both Charles and Warren Franklin were housed in Birch Hall. According to Charles and Warren Franklin, Birch Hall was also known as "Honor" Hall and inmates housed there were afforded greater privileges than other inmates in general population. Charles and Warren Franklin worked in Industries, which was a coveted work assignment. Charles and Warren Franklin were also part of the transition team for Mt. Olive regarding new policies. As members of the transition team, they usually sat on a committee for the Warden and voiced opinions on the particular policy being discussed. They also were involved in explaining and helping introduce new policies to other general population inmates.

29. According to Warren Franklin, other inmates in 1999 had tried to get him and his brother kicked out of Birch Hall by accusing them of acts in violation of prison disciplinary rules. According to Warren Franklin, these accusations were investigated by Mt. Olive and found not to be true.

30. Prior to October 2, 2000, there had been another demonstration. The Franklin brothers, due to their influence with other inmates, were asked by the Mt. Olive administration to talk with other inmates in order to end the demonstration. Neither Franklin brother had been charged or accused of being involved in that demonstration.

31. Mt. Olive had been treating Charles and Warren Franklin fairly, if not preferentially, prior to and at the time Mt. Olive conducted the investigation into the October 2, 2000 demonstration. The Petitioners have not shown the disciplinary proceedings against them for demonstration was motivated by bias or the product of uncritically accepting without investigation the word of other inmates.

32. Near the end of Warren Franklin's punitive segregation in October of 2001, an initial administrative segregation hearing was held September 13, 2001 to determine whether he should be placed in administrative segregation or with general population. Warren Franklin was recommended by the Administrative Segregation

8

Committee to be placed in administrative segregation based on his statements to the committee and on the danger he posed to the safe and secure operation of the facility at the time. *(Bate 109)*. Warden Howard Painter approved this placement.

33. After Warren Franklin's initial placement in administrative segregation, administrative segregation hearings were held weekly until November 15, 2001. Thereafter, administrative segregation hearings were held once every month until December 2003.

34. Mt. Olive's Operational Procedure #3.31 (Administrative Segregation Procedures) governs the procedures for placement in administrative segregation. After every administrative segregation hearing, the administrative segregation committee makes a recommendation to either continue segregation, to place the inmate in a step-down program, or to return the inmate to the general population. The recommendation is forwarded to the Warden or Acting Warden who makes the final decision on segregation. The Warden or Acting Warden is not bound by the recommendation and may release an inmate back into general population in spite of a negative recommendation. An inmate may appeal the decision of the Warden to the commissioner of Corrections.

35. At the initial administrative segregation hearing, Mt. Olive's Operation Procedure #3.31 provided notice to the inmate of the hearing, the opportunity for the inmate to appear in front of the administrative segregation committee, speak for himself, offer facts and information on his own behalf, comment on information utilized by the committee and the ability to request the assistance of another inmate at the hearing. The inmate also was afforded the opportunity to call and cross-examine witnesses subject to approval of the committee chairman at the initial hearing. At subsequent administrative segregation reviews, the inmate retained all the same procedural provisions except the right to be represented or to call or cross-examine witnesses.

36. Under Mt. Olive's Operational Procedure #3.31, the decision to recommend that an inmate be placed in administrative segregation was based upon

9

information or evidence such as:

1) A record of disciplinary rule violations during incarceration which shows a pattern or tendency of behavior which is violent, assaultive or otherwise threatening to the inmates, staff or the public.

2) Information from staff or other inmates indicating inmate has engaged or plans to engage in activities which are a threat to the public, staff or other inmates; threatening behavior or words; or to otherwise commit a Class I rule violation, as set forth in the Disciplinary Rules. If the information is from a confidential source (i.e. another inmate, a civilian etc.), the member presenting the information to the committee shall be required to justify, to the committee's satisfaction, why said source should be considered reliable and credible.

3) Psychological testing or psychiatric examinations or a criminal record showing a propensity for violence.

4) Specific information showing that the inmate is involved in any behavior that disrupts the safe, secure operation of the Complex; including but not limited to: assaults, repeated insubordination, agitation, indebtedness, cell larceny, gang membership, inter-gang tension, strong-arm tactics, homosexual involvement, riot, hostage taking, suspicion of being an informant or escape plans.

5) A review of the inmate's total record indicated that the inmate is not able to function in the general population.

6) Specific information indicating that the inmate may be a threat to the public, staff, other inmates, or the safe and secure operation of the Complex, may include, but not necessarily limited to a history or multiple escapes from a secure prison facility and/or jail; a history of planning, leading, agitating or participating in demonstrations, sit down strikes, riots or hostage takings during incarceration; active membership or leadership in any gang, hate group, or security threat group; and commission of a felony or felonies while in the custody of, while escaping from, or on escape status from the Division of Corrections.

37.     Under Operational Procedure #3.31, an inmate was scored on eight factors; Nature of Write-Up, Length of Punitive Sentence, Prior Disciplinary Record, Behavior in Unit, Housing and Conduct Reports, Psychological Evaluation, Individual Program Compliance, and Reason in Administrative Segregation. An inmate who scored below a certain level may be considered for a recommendation for a release from administrative segregation, unless other circumstances would indicate that the inmate is too great a risk for placement in the general population.

38.     Under Operational Procedure #3.31 "[a]ny inmate who received a score of 5 in factor H (Reason in Administrative Segregation) will be required to be recommended for Administrative Segregation. Factor H stated:-

10

To be assigned a score by the Ad-Seg Committee. Areas to be considered in this factor would include items such as, but not limited to:

5 =    a) A history of or multiple escapes from a secure prison facility and/or jail

b) A history of planning, leading, agitating or participating in demonstrations, sit-down strikes, riots or hostage takings during incarceration

c) Active membership or leadership in any gang, hate group or security threat group

d) Commission of a felony or felonies while in the custody of, while escaping from or on escape status from the Division of Corrections.

Factor H covers inmate conduct which strikes at the heart of the Warden's ability to maintain a safe and secure prison. The decision regarding such an inmate's release into the general population is placed in the hands of the Warden.

39. Under Operational Procedure #3.31, Warren Franklin was recommended for administrative segregation from September 2001 until December 2003. On January 5, 2004, the "Quality of Life" program, Operational Procedure #3.36 replaced Operational Procedure #3.31 regarding the placement of inmates in administrative segregation.

40. According to Warren Franklin's deposition in 2004, there were serious, unresolved issues with Russell Lassiter, who was believed by Warren Franklin to have set him up regarding the October 2, 2000 demonstration charges. *(Warren Franklin depo. at p. 23-33).* According to his deposition, Warren Franklin did not believe that placing him and Russell Lassiter in the same general population at Mt. Olive was safe. According to his deposition, Warren Franklin wanted Mt. Olive to move Lassiter to another facility.

41. Based on Lassiter's conduct in prison, including the murder of another inmate, Mt. Olive did not view transfer of Lassiter to a less secure facility as appropriate.

42. Based in part on Warren Franklin's past criminal and prison record, Mt. Olive took seriously the possibility of serious trouble, including trouble with Russell Lassiter, should Warren Franklin be released to general population and made the decision to continue him in administrative segregation.

43. In January 2004, Warren Franklin was placed in the Quality of Life

11

program at Level Three. The Quality of Life Program is "a behavior driven progressive incentive system consisting of five levels, which encourages appropriate behavior through behavior modification and programs participation and/or compliance. Level One being the most restrictive and Level Five being the least restrictive. An inmate, who has worked his way up to Level Five and has been successful at Level Five, may be approved to rejoin the general population at Mt. Olive.

44.    Warren Franklin worked his way through Levels Three, Four and Five and was released into the general population of Mt. Olive in the Spring of 2005.

45.    Near the end of Charles Franklin's punitive segregation in March of 2002, an initial administrative segregation hearing was held February 21, 2002 to determine whether he should be placed in administrative segregation or with general population. Charles Franklin was recommended by the Administrative Segregation Committee to be placed in administrative segregation based on his need for a psychological evaluation, his treat to the safe and secure operation of the facility, his commission of a felony while in Correctional Custody, and the demonstration which resulted in his placement in punitive segregation. *(Bate 408)*. Acting Warden, Michael Coleman, approved this placement.

46.    In October of 2001, prior to Charles Franklin's initial administrative segregation hearing (and one month after Warren Franklin's), Coleman received a memorandum alerting him to communications involving Charles Franklin, in which Franklin expressed violent thoughts about killing and his belief that there would be a violent resolution to his feud with Russell Lassiter. The memorandum included two letters from Charles Franklin, which stated, in part:

> I'm into hating the world … works for me. Besides, I don't need a gang. I'm the meanest m***** f***** in this place. No brag, "Fact." I'll cut a m***** f****** heart out and eat it while I watch him die… *(Bate 800)*.

> You keep an eye on Rusty L. and that bunch. He won't do anything, but he'll find some robots to do his dirty work. That's the way a coward works. Tell Kelly they'll be no more peace until I'm dead or he is dead. Nothing in between. He wanted to kill Jeanie and Little Kelly. A kid and a woman. Let him come kill me. I'll slap him down and f*** him like the punk he is…. *(Bate 801)*

12

Cowards run when they come face to face with a real killer. They have a problem with killing. I just hate the mess it makes. There should be a cleaner way to kill people... *(Bate 805)*.

Coleman's memorandum was forwarded to the administrative segregation file, the Associate Wardens of Security and Programs and the Director of Classification.

47. The letters written by Charles Franklin contradict his testimony to this Court that he did not have any problems with Russell Lassiter and had been a model prisoner.

48. The memorandum and letters were not the only confidential information received by Coleman or the Warden's office regarding Charles and Warren Franklin.

49. After Charles Franklin's initial placement in administrative segregation, administrative segregation hearings were held weekly until April 18, 2002. Thereafter, administrative segregation hearings were held once every month until December 2003. Under Policy Directive 3.31, the administrative segregation committee could not recommend Charles Franklin for general population based on his record of demonstration and a conviction for second degree murder while in prison. The Warden's office upheld the recommendations and did not release Charles Franklin into general population.

50. Based in part on Charles Franklin's past criminal and prison record, Mt. Olive took seriously the possibility of serious trouble, including trouble with Russell Lassiter, should Charles Franklin be released to general population and made the decision to continue him in administrative segregation.

51. In January of 2004, Charles Franklin was placed in the Quality of Life Program at Level Three.

52. In October of 2004, Charles Franklin was found guilty of the use and possession of drugs, intoxicants or paraphernalia, in violation of rule 1.19 of Policy Directive 325.00 (MOC-04-0858). *(Bate 601)*. This was a Class I violation. Franklin was found with a cup of red liquid giving off a strong odor. Franklin had added water to jello and it had been left for less than 24 hours before it was discovered. The liquid tested

13

positive for alcohol content. According to Franklin, he had no idea the mixture would start to ferment and turn into alcohol.[2] Franklin was given 60 days of punitive segregation and 60 days loss of all privileges.

53. Policy Directive 325.00, Section 1.19 defined use and possession of drug, intoxicants, paraphernalia as:

> Intoxicants shall be defined as any narcotic drug, prescription drug, alcoholic substance or substance which may be injected, consumed, "huffed," inhaled or ingested by any means with an intoxicating effect.
>
> 1. No inmate shall use, possess, inject, inhale, "huff," ingest by any means, or be under the influence of a drug or intoxicant...
>
> ***
>
> 4. No inmate shall use or possess any drug/intoxicant paraphernalia. An inmate shall be held responsible for any such items found in his/her own living area.

54. After being given 60 days loss of all privileges, Charles Franklin made numerous phone calls during that 60 day period in defiance of the loss of all privileges. As a result of these unauthorized phone calls, Charles Franklin was found guilty in November 2004 of the following violations: Refusing an Order (MOC-04-0942 through 0948) and Cumulative Class II violations (MOC-04-0940, 0941), a Class I violation. In April of 2005, Charles Franklin was also found guilty of fraudulent representation (MOC-05-0284) for using his brother's D.O.C. number to make an unauthorized phone call. Charles Franklin refused to attend any of these disciplinary hearings. *(Bate 566-568, 582-599)*.

55. As a result of Charles Franklin's behavior and disciplinary infractions, his level in the Quality of Life program was reduced From Level Three to Level One. To be promoted back to Level Three under Operational Procedure #3.36 required that an inmate "not be convicted of any Class I violations for the past twelve (12) months" before he could be considered for advancement back to Level Three.

---

[2] Presumably after almost thirty years in prison, Charles Franklin had no idea how to make alcohol using a source of sugar. Presumably, nicknames such as "wino" and "20/20 Mad – Dog" also indicated his lack of knowledge regarding alcohol. *(Bate 802, 806)*.

56. On or about May 2006, Charles Franklin advanced through the Quality of Life Program and was placed in general population.

## CONCLUSIONS OF LAW

### PETITIONERS' CLAIMS AGAINST PLACEMENT IN ADMINISTRATIVE SEGREGATION

1. As recognized by the United States Supreme Court, administrative segregation is "well within the terms of confinement ordinarily contemplated by a prison sentence." Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864, 869 (1983). In West Virginia, Corrections has many levels of custody based on the inmate's security classification – from Work Release to dorm style living to closely guarded segregated cells. Administrative segregation may be a comparative hardship/deprivation to the Franklins when compared with being in mainline population in Mt. Olive Correctional Complex. However, being in mainline population at Mt. Olive Correctional Complex is a comparative hardship/deprivation when compared with being at Pruntytown Correctional Center or Charleston Work Release. Hardship and deprivation are implicit in an inmate's sentence. See Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399 (1981) ("But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."), Conner v. Griffith, 160 W.Va. 680, 689, 238 S.E.2d 529, 534 (1977) ("Time spent serving a sentence does not depend on the manner or location in which it is served. There are, to be sure, different degrees of confinement recognized in any penal system. The fact that some confinements are less restrictive than other should have no bearing in computing the time served on the sentence").

2. Regarding the use of administrative segregation, the United States Supreme Court has stated "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Hewitt, 459

U.S. at 472, 103 S.Ct. at 872 (citing Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861 (1979).

3.     The Eighth Amendment to the United States Constitution contemplates that a prison will be proactive in protecting inmates from harm. See Farmer v. Brennan, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").

4.     The use of administrative segregation to house inmates, who pose a threat to the safe and secure operations of a correctional facility, is reasonably related to a legitimate penal interest.

5.     In light of the petitioners' violent prison and criminal histories and credible information that placing the petitioners in the general population could lead to serious harm and or death, Mt. Olive's decision to place and keep the petitioners' in administrative segregation was not arbitrary and capricious and was in conformity with the Eighth Amendment to the United States Constitution.

6.     The petitioners mistakenly assert in their pro se Petitions for Writ of Habeas Corpus Ad Subjiciendum (p. 7) that Tasker v. Griffith, 160 W.Va. 739, 238 S.E.2d 229 (1977) limits administrative segregation to investigations prior to prison disciplinary hearings. Tasker specifically provides the following caveat, "[w]e limit our review of administrative segregation procedures to those instances where an inmate is confined during an investigation of his misconduct, since this appeal does not involve other types of administrative segregation, such as protective custody." Footnote No. 1, Tasker, supra. Tasker recognizes that administrative segregation is not limited to situations where the inmate is confined pursuant to an investigation into a rule violation.

7.     Moreover, contrary to the petitioners' assertion in their pro se Petitions for Writ of Habeas Corpus Ad Subjiciendum (p. 7), administrative segregation does not implicate the constitutional prohibition against double jeopardy. West Virginia has rejected applying double jeopardy to prison disciplinary hearings. See Syl. Pt. 3, Conley v. Dingess, 162 W.Va. 414, 250 S.E.2d 136 (1978). In Conley, the Supreme Court wrote:

16

> The petitioner contends as a further ground for relief in his petition for habeas corpus that administrative disciplinary action imposed by the penitentiary authorities as a result of his escape and conviction therefor in the circuit court constitute double jeopardy in violation of his constitutional rights. Our research reveals that this contention of the petitioner is entirely without merit.
> Conley, 162 W.Va. at 416, 417, 250 S.E.2d 137.

Certainly, if the State can impose a new prison sentence (pursuant to a criminal prosecution) for conduct which has already been "punished" in a prison disciplinary hearing, the State is not barred on grounds of double jeopardy from subsequently placing an inmate in administrative segregation when the inmate is believed to pose a threat to the safe and secure operation of the prison facility if he is left in the mainline inmate population.

8.     Double jeopardy deals with government actions designed to punish. Placement in administrative segregation is not meant as a punishment, but as solution to the problem of safely housing large numbers of dangerous felons in a prison. Making the appropriate custody classification is an integral part of Corrections' duty to provide for the safety of the public, staff, and inmates. Some of Corrections' inmates are inherently dangerous and cannot be safely placed in general population. If one accepts the petitioners' double jeopardy argument, then dangerous inmates after serving their punishment for a violation of prison disciplinary rules would be entitled to return to the same custody level prior to the disciplinary rule violation and to return to the same housing (including general population) even when that prior custody level/housing is no longer judged by prison officials to be sufficient to control that inmate.

9.     The placement in administrative segregation or any other change in the conditions of confinement does not increase the length of an inmate's sentence or punishment. See Conner, supra.

10.     Even if "administrative segregation" is considered a punishment for purposes of the double jeopardy clause, the elements and underlying conduct required for "administrative segregation" are distinct from the elements and underlying conduct required for "punitive segregation."

17

> The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense.
> Syl. Pt. 2, State v. Gill, 187 W.Va. 136, 416 S.E.2d 253 (1992), Syl. Pt. 1, Conner, supra.

11. Under Mt. Olive's Operational Procedure #3.31 (Administrative Segregation Procedures), a conviction of "demonstration" did not mandate placement in "administrative segregation." The factors or elements necessary to be considered before assignment to "administrative segregation" (see finding of fact #36) were not the same as the elements necessary to find a violation of the disciplinary rule against "demonstration" and would not be (or were intended to be) the same offense under the double jeopardy test set forth in State v. Zaccagnini, 172 W.Va. 491, 308 S.E.2d 131 (1983), and Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180 (1932).

12. The petitioners have not shown that they were denied due process in their initial and continued assignment to administrative segregation.

13. In Wilkinson v. Austin, the United States Supreme Court reviewed the procedures for committing inmates to the super maximum security prison in Ohio. Wilkinson, 545 U.S. 209, 125 S.Ct. 2384 (2005). The supermax facility reviewed by the United Supreme Court was described as a place where almost all human contact is prohibited including cell to cell conversation. The inmates remain in their cell except for one hour of daily indoor exercise. Inmates assigned to the supermax facility are not eligible for parole release and assignment can be indefinite. A review of an inmate's placement in the supermax facility is held once a year. The supermax facility in Wilkinson was distinguished from administrative segregation, "[c]onditions as OSP [Ohio State Penitentiary] are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units. The latter are themselves a highly restrictive form of solitary confinement."

14. In Wilkinson, a unanimous United States Supreme Court found that:

18

Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal nonadversary procedures set forth in *Greenholtz* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); and Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864 , 74 L.Ed.2d 675 (1983) provide the appropriate model.... Ohio's New Policy provides informal, nonadversary procedures comparable to those we upheld in *Greenholtz* and *Hewitt* and no further procedural modifications are necessary in order to satisfy due process..."
Wilkinson, 545 U.S. at 229, 125 S.Ct. at 2397.

15. The due process requirements spelled out in Hewitt were:

An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.
Hewitt, 459 U.S. at 476, 103 S.Ct. at 874.

16. Mt. Olive's Operational Procedure #3.31 provided the petitioners with greater safeguards than notice and the opportunity to present their views to the administrative segregation committee as required under Hewitt and Wilkinson, and, thus, complied with any due process requirements.

17. Mt. Olive's Operational Procedure #3.36 (Quality of Life) does not address the initial decision to place an inmate in administrative segregation and would not have been applied in the petitioners' initial assignment to administrative segregation. Under the Quality of Life program, the petitioners were provided monthly reviews of their status, provided notice of the reviews and provided the opportunity to present their views to the reviewing committee. The petitioners were provided due process.

18. The petitioners have been released from administrative segregation and their claim for release from administrative segregation is moot.

19. "Courts will not ordinarily decide a moot question." Syl. Pt. 1, Tynes v. Shore, 117 W.Va. 355, 185 S.E. 845 (1936). "Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions

19

presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided." Israel by Israel v. West Virginia Secondary Schools Activities Commission, 182 W.Va. 454, 388 S.E.2d 480 (1989).

20. Mt. Olive's Operational Procedure #3.31 was discontinued in January 2004 and replaced by Operational Procedure #3.36 (Quality of Life). There are no collateral consequences by addressing the application of a discontinued operational procedure.

21. An inmate has no recognizable right to a particular work assignment and there is no recognizable right to back pay or compensation based on the termination of a work assignment or a right to reinstatement. See Washlefske v. Winston, 234 F.3d 179 (4th Cir. 2000) (inmates do not have constitutionally protected property interest in the wages earned from their labor).

22. Assignment to administrative segregation is not per se cruel and unusual punishment and the petitioners have not shown that their stay in administrative segregation was marked by any additional deprivations which would transform that stay into a constitutional violation recognizable under 42 U.S. Code § 1983 action. See In re Longterm Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir. 1999). Any pain, suffering or mental anguish resulting from segregation would have been "well within the terms of confinement ordinarily contemplated by a prison sentence." Hewitt, 459 U.S. at 468, 103 S.Ct. at 869.

23. The petitioners' have not raised additional monetary or equitable claims, including claims for back pay and mental anguish, which would transform their moot claim for release from administrative segregation into a non-moot civil damages action.

PETITIONERS' CLAIMS AGAINST BEING DISCIPLINED FOR VIOLATION OF THE DISCIPLINARY RULE AGAINST "DEMONSTRATIONS"

24. The evidentiary requirements for prison disciplinary hearings is "some evidence."

20

Snider v. Fox, 218 W.Va. 663, 667, 627 S.E.2d 353, 357 (2006) (citing Superintendent, Massachusetts Corr. Inst., Walpole v. Hill, 472 U.S. 445, 457, 105 S.Ct. 2768, 2775 (1985)("The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board. Instead, due process in this context requires only that there be *some evidence* to support the findings made in the disciplinary hearing.")). Under Snider and Walpole, "[a]scertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Snider, 218 W.Va. at 667, 627 S.E.2d at 357 (citing) Walpole, 472 U.S. at 455-56, 105 S.Ct. at 2274).

25. The Correctional Magistrate's finding that the petitioners were guilty of organizing, participating in the organization of, or participating in a group demonstration, protest, sit-down strike, 'sick-out', hunger strike, work stoppage or any other joint demonstration, or attempt to do any of the above, was supported by, at a minimum, some evidence.

26. Even assuming that there was a factual basis for the petitioners' claim set forth in the petitioners' Petition for Writ of Habeas Corpus Ad Subjiciendum (p. 3) that they did not receive a copy of Policy Directive 325.00, dated July 1, 2000,[3] there was no violation of the petitioners' due process rights.

27. In State ex rel. Gillespie v. Kendrick, 164 W.Va. 599, 265 S.E.2d 537 (1980), the West Virginia Supreme Court addressed what due process must be provided before an inmate could have good time credit taken away for a rule violation under West Virginia Code § 28-5-27.

---

[3] Given the petitioners insistence under oath to this Court that they had had no problem in the past with Russell Lassiter, in spite of at least two letters in which Charles Franklin had written to the effect that either he or Lassiter would end up dead, no in between, this Court is reluctant to credit unsubstantiated factual claims made by the petitioners.

21

In State ex rel. Gillespie, the Supreme Court wrote:

This Court holds that in the prison context it is constitutionally required by the due process clause that the rules specifying prohibited conduct and the range of penalties for their infraction be written with reasonable specificity so that the inmate has fair warning to conform. Such fair warning requires that the rules must somehow be communicated to those so required to conform.

\*\*\*

**Notification of the inmates of the rules could be perfected by publishing the rules at several convenient locations in the prison to which the inmates have full access.**
State ex rel. Gillespie, 164 W.Va. at 605, 606, 265 S.E.2d at 541 (Bold Added).

The Franklins exact complaint is that they did not receive a personal copy of Policy Directive 325.00 (dated July 1, 2000) and, as such, they cannot be disciplined for any violation of those rules. State ex rel. Gillespie, however, holds that due process does not require that an inmate receive a personal copy of the disciplinary rules.

28.     Analytically, State ex rel. Gillespie does not provide an inmate with any greater due process rights to notice than a criminal defendant. An inmate facing prison discipline does not possess greater due process rights than a defendant facing criminal charges. See Sigman v. Whyte, 165 W.Va. 356, 268 S.E.2d 603 (1980), State ex rel. Eads v. Duncil, 196 W.Va. 604, 609, 474 S.E.2d 534, 539 (1996). In criminal matters, a defendant cannot avoid prosecution on the grounds that the Secretary of State's office did not personally serve him with a copy of the criminal code. Due process requires simply that the criminal code is officially published and the affected public has reasonable access to the published code. This is what State ex rel. Gillespie mandates for inmates – reasonable access to the published disciplinary rules.

29.     In the present case, Corrections' Policy Directive 325.00 dated July 1, 2000 was published and made available to inmates. Inmates would have been able to pick up their own copy from the unit manager. Copies would have also placed in the library and each housing unit (i.e. several convenient locations in the prison). Mt. Olive met its due process requirements and if the Franklins did not get their own copy of the July 2001

22

rules, it would have been due to their own inaction. Assuming that the Franklins' allegation that they did not receive an actual copy of the disciplinary rules is true, this allegation does not state a due process violation that would overturn the disciplinary proceedings.

30. Even assuming that the Franklin brothers had a due process right to receive personal copy of the July 1, 2000 version of Policy Directive 325.00, their due process claim must fail because there was no prejudice. See Russell v. Oliver, 392 F.Supp. 470 (W.D. Va. 1975) (failure to post disciplinary rules is not a per se constitutional violation without showing of prejudice), vacated in part on other grounds, 552 F.2d 115 (4th Cir. 1977), Higgason v. Swihart, 1995 WL 358769 (N.D. Ind), Smith v. Coughlin, 583 N.Y.S. 2d 622 (App. Div. 1992). West Virginia law recognizes harmless error. State ex rel. Grob v. Blair, 158 W.Va. 647, 214 S.E.2d 330 (1975) ("Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.").

31. The purpose of notification is to apprise the inmate of what conduct can subject him to discipline. See State ex rel. Gillespie, 164 W.Va. at 605, 265 S.E.2d at 540, 541 (1980) ("so that the inmate has fair warning to conform" his conduct to the rules). The law, in general, does not seek to punish those who acted under the reasonable assumption that their conduct was lawful. Harm may exist when an inmate is unaware that his conduct violates an unknown disciplinary rule and would have conformed his conduct to the rule had he known of it. Here, however, both Franklins admitted that they understood planning and encouraging a demonstration such as the one on October 2, 2000, was wrong. Both Franklins have asserted under oath that they never would have done such a thing because it would have gotten them written up and disciplined. This is consistent with the Franklins' claim that they are innocent of the actual conduct. Both Franklins knew beforehand that the conduct they were accused of (planning, encouraging a demonstration) was against the disciplinary rules of Mt. Olive. Placing a copy of the

23

disciplinary rules in their hands prior to the October 2000 demonstration would not have affected their role in the demonstration (or according to the Franklins, lack thereof) and subsequent conviction.

32.    Absent a due process violation or harm, any failure to provide the petitioners with an updated version of Policy Directive 325.00 would have entitled the petitioners to a mandamus action for the provision of a personal copy under West Virginia Code, § 28-5-27 and no more.

33.    Additionally, the dictates of West Virginia Code, § 28-5-27 applies to the earning of good time (and the loss thereof) and its provisions are not directed towards disciplinary actions resulting in the placement in punitive segregation or loss of privileges.

34.    Contrary to the petitioners' assertion in their pro se Petitions for Writ of Habeas Corpus Ad Subjiciendum (p. 7), the "punishment" of one year (Warren Franklin) and one and a half years (Charles Franklin) of punitive segregation was not disproportionate.

35.    "In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction." Syl. Pt. 5, Wanstreet v. Bordenkircher, 166 W.Va. 523, 276 S.E.2d 205 (1981). Proportionality has been applied to prison disciplinary hearings. See Keenan v. Bordenkircher, 170 W.Va. 372, 294 S.E.2d 175 (1982)(10 years sentence of punitive segregation ruled disproportionate punishment for inmate's escape).

36.    In the present case, the October 2000 demonstration involved approximately 278 inmates and could have very easily turned into a riot. Prison officials were faced with 278 inmates refusing to obey any orders, including orders to return to their cells. The loss of control of 278 inmates represented a direct threat to institutional security for the entire prison. A state of emergency was needed from October 2 to October 17, 2000. It was not

24

an isolated incident, such as an assault, in which a few correctional officers can restore and maintain order by removing the two or three inmates involved.

In addition to the seriousness of the violation, this was not the first time the Franklins had committed a serious rule violation. Both brothers had a history of rule violations (not including convictions for the murder of another inmate at the West Virginia State Penitentiary which was not charged as a rule violation and the brothers' successful prison escape in Maryland). Yet, in spite of the seriousness of the offense and the Franklins' prison history, the Correctional Magistrate did not impose for either brother the maximum two years of punitive segregation permitted under Policy Directive 325.00 at the time. The punishments were well within the established disciplinary rules and not excessive.

37. Administrative segregation is not punishment but one of many levels of custody and is based on a determination that an inmate would pose a substantial risk to institutional and inmate security if not segregated from the general inmate population.

38. A proportionality challenge assumes that the length of the "punishment" can be determined and that the inmate cannot readily change the length of the "punishment." Here, the length of an inmate's stay in administrative segregation depends upon whether the inmate can be safely returned to the mainline inmate population. If so, then administrative segregation will end. If not, administrative segregation will be continued to be imposed and, if necessary, imposed for the entire length of the inmate's sentence. The length of an assignment to administrative segregation depends on the inmate's own behavior. Administrative segregation may end at the next monthly review or continue for several years. In the end, a reviewing court cannot apply a proportionality analysis to a commitment to administrative segregation because there is no set amount of time an inmate must spend in administrative segregation.

39. The petitioners are no longer housed in punitive or administrative segregation and a claim that their placement in either type of segregation is disproportionate is moot.

25

PETITIONER CHARLES FRANKLIN'S CLAIM AGAINST BEING DISCIPLINED FOR VIOLATION OF THE DISCIPLINARY RULE AGAINST "POSSESSION OF DRUGS, INTOXICANTS OR PARAPHERNALIA."

40.     The evidentiary requirements for prison disciplinary hearings is "some evidence." Snider v. Fox, 218 W.Va. 663, 667, 627 S.E.2d 353, 357 (2006).  The correctional magistrate was presented with some evidence that Charles Franklin was in the process of fermenting jello and water into alcohol and that Charles Franklin was in the possession of an intoxicant and the paraphernalia used in the making of that intoxicant.

41.     The petitioner Charles Franklin has not challenged his remaining disciplinary rule violations for "failure to obey an order" regarding telephone privileges, "cumulative Class II violations," and "fraudulent representation" regarding using his brother's prison identification number to make a phone call.


## ORDER

WHEREFORE, for the above reasons, this Court denies the Petition for Writ of Habeas Corpus and Orders that this matter be dismissed and stricken from the docket.


DATE: _September 11, 2012_     ENTER: _____
                                        Judge Jennifer Bailey


Prepared By:

DARRELL V. MCGRAW, JR.
WEST VIRGINIA ATTORNEY GENERAL

_____
John H. Boothroyd, W. Va. Bar I.D. 6769
Assistant Attorney General
112 California Ave
Building 4, Room 300
Charleston, WV 25305
(304) 558-2036

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF THE CIRCUIT COURT OF SAID COUNTY AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 14
DAY OF September 2012
Cathy S. Gatson CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

26